**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| MATTHEW PIXLEY and JOSEPH FERNICOLA, Derivatively on Behalf of MICROVAST HOLDINGS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>YANG WU, FARIYAL KHANBABI, CARL T. SCHULTZ, RODNEY WORTHEN, WEI YING, ARTHUR WONG, SHING PAN, and ISIDA TUSHE,<br><br>Defendants,<br><br>and,<br><br>MICROVAST HOLDINGS, INC.,<br><br>Nominal Defendant. | Case No: 4:26-cv-09548<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Matthew Pixley and Joseph Fernicola ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Microvast Holdings, Inc. ("Microvast" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

## JURISDICTION

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein under Section 14(a) of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

5. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiffs

6. Plaintiffs are, and were at relevant times, shareholders of the Company. Plaintiffs will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7. Nominal Defendant Microvast is a Delaware corporation with principal executive offices located at 12603 Southwest Freeway, Suite 300, Stafford, Texas 77477. The Company's common stock trades in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "MVST".

### Director Defendants

8. ***Defendant Yang Wu*** ("Wu") Microvast's founder, served as its Chief Executive Officer ("CEO") and Chairman of its Board of Directors ("Board") at all relevant times.

9. ***Defendant Wei Ying*** ("Ying") has served as a director of the Company at all relevant times. Defendant Yang also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee.

10. ***Defendant Arthur Wong*** ("Wong") has served as a director of the Company at all relevant times. Defendant Wong also serves as chair of the audit committee and as a member of the compensation committee and nominating and corporate governance committee.

11. ***Defendant Shing Pan*** ("Pan") has served as a director of the Company at all relevant times. Defendant Pan also serves as chair of the Compensation Committee and Nominating and Corporate Governance Committee and serves as a member of the Audit Committee.

12. ***Defendant Isida Tushe*** ("Tushe") has served as a director of the Company at all relevant times.

13. Defendants Wu, Ying, Wong, Pan, and Tushe are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

14. ***Defendant Fariyal Khanbabi*** ("Khanbabi") served as Microvast's Chief Financial Officer ("CFO") until April 7, 2025.

15. ***Defendant Carl T. Schultz*** ("Schultz") served as Microvast's CFO between April 21, 2025, and July29, 2025.

16. ***Defendant Rodney Worthen*** ("Worthen") served as Microvast's Interim CFO from August 7, 2025, until January 7, 2026, when he was appointed CFO on a non-interim basis.

17. Defendants Wu, Khanbabi, Schultz, and Worthen are collectively referred to herein as the "Officer Defendants."

18. The Director Defendants together with Officer Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

19. Microvast is a company which designs, develops, and manufactures lithium-ion battery components and systems. Although Microvast is headquartered in Texas, the Company

conducts much of its operations in the city of Huzhou in the People's Republic of China. The Company's battery technology is chiefly marketed for use in commercial electric vehicles and ESS.

20. Microvast's business model emphasizes vertical integration, and to that end the Company's technology encompasses all levels of battery development from core cell materials to management systems. This includes basic battery cell components such as cathodes, anodes, electrolytes, and separators, as well as cooling systems and software controls for battery packs.

21. The Company markets its products to several bus platforms including Citybus and Crossway, and sells its battery technologies within the port and mining industries to customers such as Kalmar Corp. The Company purports that its electric commercial vehicle battery technology can provide roughly 10% to 80% charging in under thirty minutes. One of the Company's notable products is its high-energy NMC 53.5Ah battery cell (the "NMC Battery Cell"), intended for long-range commercial vehicle and ESS applications.

22. To fully develop and market the NMC Battery Cell, Microvast has invested heavily in the Huzhou Facility. The Huzhou Facility currently produces batteries through the Company's Huzhou Phase 3.1 line, which the Company intends to expand through the addition of the Phase 3.2 line. The Company has stated that it expects the Phase 3.2 line's equipment installation to conclude in 2026.

23. As of December 31, 2025, the Company purported to have an annual manufacturing capacity of roughly "3.5 GWh of cell, module and pack capacity, 600 tons of annual cathode capacity, 3,000 tons of annual electrolyte capacity and 5 million square meters of annual separator material capacity[.]" The Company has noted that the manufacturing capacity noted above derives solely from the Huzhou Facility.

24. The Company markets its products according to three regional categories: Europe, the Middle East, and Africa ("EMEA"); North and South America; and Asia & Pacific. Microvast's revenue mix has shifted substantially towards the EMEA region, with the EMEA region accounting for the largest portion of the Company's revenue in both 2025 and 2024.

25. On April 9, 2025, the Company filed a current report on Form-8K with the SEC (the "CFO Transition 8-K") which noted that on April 7, 2025, Defendant Khanbabi "ceased to be employed as Chief Financial Officer of [the Company]." The CFO Transition 8-K further announced the appointment of Defendant Schultz as the Company's CFO.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

26. On March 31, 2025, Microvast filed an annual report on Form 10-K with the SEC, reporting its financial and operating results for the quarter and year ended December 31, 2024, and issued a press release announcing the same (the "FY 2024 Earnings Release"). That press release quoted Defendant Wu as touting the Company's purported performance for the year, providing investors with a timeline for the Company's Huzhou Phase 3.2 expansion, and stating the Company's "core focus" was "achieving sustainable profitability":

> "We achieved record quarterly revenue in the fourth quarter of 2024, beating revenue guidance. This brings our full year revenue growth to 23.9% and we delivered these revenues at a gross margin also above guidance. The revenue growth achieved in [Europe, Middle East, and Africa ("EMEA")] is encouraging and we would expect to continue this growth into 2025," said Yang Wu, Microvast's Founder, Chairman, and Chief Executive Officer. "***In [Asia & Pacific Region ("APAC")], we are underway with our Huzhou Phase 3.2 expansion and anticipate to have this additional capacity online in the fourth quarter of 2025*** to meet increasing customer demand as we prioritize uncovering new opportunities and market segments. Our backlog has grown to $401.3 million as regional demand for our technology continues to rapidly grow. We have realized great successes in the global heavy industrials segment and the maturing Korean market. The significant strides we've made in operational efficiencies in the second half of 2024 will continue into 2025 as our core focus remains on achieving sustainable profitability." [Emphasis added].

27. During a conference call to discuss the financial results announced in the FY 2024 Earnings Release, Defendant Wu provided investors with an update concerning the Huzhou Phase 3.2 initiative, stating that the Individual Defendants "anticipate first qualified production to come online in the fourth quarter of 2025":

> We are happy to give a progress update on our Huzhou Phase 3.2 expansion project. This new line should give us up to an additional 2 gigawatt hour per year of production capacity in order to meet the high demand for our products. Cleanroom utilities and equipment installation are all well underway. The expansion leverages our existing infrastructure and expertise and will help enable us to produce both current and future technologies. ***We anticipate first qualified production to come online in the fourth quarter of 2025***.

28. Defendant Khanbabi touted the gross margin figures the Company announced in the FY 2024 Earnings Release, stating that they were the "result[]" of gross profit "driven by operational efficiencies, increased utilization and disciplined cost control implementation" implying that this improved margin would persist into the future:

> Gross profit for Q4 2024 was $41.5 million, up from $23 million in Q4 2023, an 80% improvement ***driven by operational efficiencies, increased utilization and disciplined cost control implementation***. This resulted in a gross margin of 36.6% compared to 22% in the prior year period, a 14.6 percentage point improvement. For the full year, gross profit was $119.6 million, more than double the prior year's $57.2 million, reflecting a 109% increase. Gross margin for the full-year 2024 was 31.5%, up from 18.7% in 2023, a 12.8 percentage point improvement, ***reflecting operating leverage and continued efficiency gains***.

29. Defendant Khanbabi provided investors with another reason to expect improved margins into the future, as she described the Individual Defendants' "strategic repositioning away from low-margin segments" and "focus . . . towards more profitable, higher-value opportunities":

> In Asia Pacific, revenue declined from $219.1 million in 2023 to $177.7 million in 2024, a 19% year-over-year decrease. ***This decline is aligned with our strategic repositioning away from low-margin segments*** in China and India, where price competition remains intense with lower-priced LFP options. ***Our focus has shifted towards more profitable, higher-value opportunities***, especially in regions that emphasize technology differentiation over commoditization.

30. Defendant Wu reinforced this during his final remarks on the FY 2024 Earnings Call, concerning Defendants' outlook for the then-upcoming fiscal year 2025. Defendant Wu stated that the Individual Defendants "aim to maintain a gross margin target of 30%" before repeating the Individual Defendants' expectation that the Huzhou Phase 3.2 initiative would "come online later this year":

> We expect 2025 revenue to increase 18% to 25% year-over-year. This puts our revenue guidance in the range of $450 million to $475 million. ***We also aim to maintain a gross margin target of 30%***. ***For our APAC business, we continue to target production capacity improvements at our Huzhou facility to meet increasing customer demand. Our Phase 3.2 expansion is anticipated to come online later this year***, which is expected to give us up to 2 gigawatt hour of additional capacity across a variety of our high-performance products. . . . To summarize, 2024 was a year of significant progress and strategic realignment for Microvast. We achieved record revenues, demonstrating the strong global demand for our high-performance battery solutions, particularly in EMEA region. ***We have significantly improved our gross margins*** and delivered positive adjusted EBITDA in the second-half of the year. Similarly, ***a clear shift towards sustainable profitability***. [Emphasis added].

31. On April 9, 2025, Microvast announced the appointment of Defendant Schultz as its CFO, advising that Schultz's tenure would begin later that month.

32. On May 12, 2025, Microvast filed a quarterly report on Form 10-Q with the SEC reporting its financial and operating results for the quarter ended March 31, 2025, and issued a press release announcing the same. In discussing the Company's "2025 Outlook", this press release reiterated the Company's target of "gross margin of 30%" and "[i]nstallation of production equipment for Huzhou Phase 3.2" in time for "first qualified products in Q4 2025":

> "2025 Outlook: . . . Through 2025, with continued regional efficiencies and utilization increases, the Company is targeting a gross margin of 30%; Installation of production equipment for Huzhou Phase 3.2, increasing our capacity to meet strong customer demand and targeting first qualified products in Q4 2025[.]"

33. Also on May 12, 2025, Microvast held a conference call to discuss the financial and operating results it announced that day (the "Q1 Earnings Call"). During this call, Defendant

Wu provided an update concerning the Huzhou Phase 3.2 initiative. Defendant Wu assured investors that the Phase 3.2 initiative "is on track", providing a detailed update on progress towards completion, and reiterated the Individual Defendants' expectation that the Company would "achiev[e] the first qualified production from this new line in the fourth quarter of 2025":

> I'd like to provide an update to our Phase 3.2 expansion. ***The clean rooms are nearly completed, utility equipment installation is complete, and we are currently installing the production equipment. Our Huzhou Phase 3.2 expansion project is on track*** to add up to two gigawatt-hours of annual production capacity, strategically positioned to, address the strong market demand for our solutions. This expansion leverages our established infrastructure and deep expertise, enabling the production of both our current and next-generation battery technologies. ***We anticipate achieving the first qualified production from this new line in the fourth quarter of 2025***. [Emphasis added].

34. Also during the Q1 Earnings Call, Defendant Wu reiterated Defendants' year-end revenue guidance and gross margin target of "approximately 30%" even as he stated that circumstances surrounding the "global supply chain" had "impacted the rollout timelines for certain light commercial vehicle platforms", implying that Defendants' targets were achievable despite these headwinds:

> While we remain optimistic about our trajectory this past quarter presented headwinds, preliminarily due to global supply chain, uncertainties and trade disruptions, which have impacted the rollout time lines for certain light commercial vehicle platforms. . . . As we look ahead through the remainder of 2025, our initial guidance remains an anticipated year-over-year revenue increase of 18% to 25%, placing our target range between $450 million and $475 million. We also continue to aim for full year gross margin of approximately 30%.

35. During his remarks on the Q1 Earnings Call, Defendant Worthen provided investors with detailed on the Company's financial performance for the quarter, highlighting the performance of Microvast's EMEA business as "key customers continue to ramp their vehicle production", stating *inter alia*: "Our EMEA business grew by 108% year-over-year and accounted

for 52% of our quarterly revenue, up from 36% a year ago as we continue to grow our partnerships and key customers continue to ramp their vehicle production."

36. Later during the Q1 Earnings Call, Defendant Wu provided investors with an outlook for the rest of the calendar year, reaffirming the Individual Defendants' full year gross margin guidance of 30% and repeating that Huzhou Phase 3.2 would be "online[] later this year" and was "crucial" to Microvast's efforts:

> As we look ahead through the remainder of 2025, our initial guidance remains an anticipated year-over-year revenue increase of 18% to 25%, placing our target range between $450 million and $475 million. We also continue to aim for full year gross margin of approximately 30%. ***Our APAC operations are focused on bringing the Phase 3.2 expansion, at our Huzhou facility online, later this year***. ***This additional capacity*** expected to reach up to 2 gigawatt hour annually, ***will be crucial*** in meeting the robust customer demand, across our diverse portfolio. [Emphasis added].

37. The statements referenced above were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) due to inventory management issues and delays in commercial vehicle rollouts by Microvast's customers, the Individual Defendants had overstated Microvast's ability to reach its margin targets; (ii) the Individual Defendants overstated Microvast's ability to complete the Huzhou Phase 3.2 expansion by the end of 2025; and (iii) as a result, the Individual Defendants' public statements were materially false and misleading at all relevant times.

## <u>THE TRUTH BEGINS TO EMERGE</u>

38. The market received its first inkling of the true state of Microvast's business and operations on June 25, 2025, when short seller Grizzly Research issued the Grizzly Report, alleging that the Company "is fabricating a significant part of its business and capabilities",

including, *inter alia*, by overstating the level of activity at its production facilities, including the Huzhou facility, and likewise overstating the prospective economic opportunities from its commercial partnerships.

39. Specifically, Grizzly Research highlighted inconsistencies in Microvast's claims concerning the number of employees that work at its Huzhou facility. Citing documents published by the Chinese government, Grizzy Research noted that the number of employees at the Huzhou facility decreased by 400 during a time at which Microvast purportedly completed an earlier Phase 3.1 expansion. Moreover, Grizzly Research claimed that Microvast issued inconsistent claims concerning the number of Huzhou facility employees. When Microvast responded to another short seller report in November 2023, it claimed that its "manufacturing plant in Huzhou, China has more than 2,500 employees". However, in the annual report on Form 10-K that Microvast filed on April 1, 2024, the Company claimed that it had fewer employees globally: "As of December 31, 2023, we had 2,006 full-time employees and 955 independent contractors."

40. Grizzy Research also claimed that the "vast majority" of Microvast's customers represented insignificant economic opportunities for the Company, despite its statements to the contrary. For example, Grizzly Research examined Gaussin, a company to which Microvast claimed it would sell more than $450 million of batteries for electric and hydrogen trucks, over the course of five years. Grizzly Research noted that Gaussin's annual revenue at the time, €10.2 million, was far too low to justify such a projection. Indeed, Gaussin has since gone bankrupt and both the company and its CEO were fined by French regulator the Financial Markets Authority Sanctions Commission for issuing false statements to investors.

41. Following publication of the Grizzly Report, Microvast's stock price plunged during intraday trading, falling as much as $0.40 per share, or approximately 10.23%, before ultimately closing at $3.90 per share.

42. Notwithstanding the foregoing disclosures and resulting drop in Microvast's share price, Microvast's stock continued to trade at artificially inflated prices due to Defendants' continued false and misleading statements about, *inter alia*, Microvast's ability to reach its margin targets and its ability to complete the Huzhou Phase 3.2 expansion by the end of 2025.

43. The market continued to grasp true state of Microvast's business and operations on August 1, 2025, when Microvast announced the departure of its CFO, Defendant Schultz, just over three months after he joined the Company. The Company released a terse statement when announcing Defendant Schultz's departure, without offering any insight as to the reasons for his departure, stating: "On July 29, 2025, Carl T. (Pat) Schultz ceased to be employed as Chief Financial Officer of Microvast Holdings, Inc."

44. On this news, Microvast's stock price fell $0.30 per share, or approximately 9.93%, to close at $2.72 per share on August 4, 2025.

45. Notwithstanding the foregoing disclosures and resulting drop in Microvast's share price, Microvast's stock continued to trade at artificially inflated prices due to the Individual Defendants' continued false and misleading statements about, *inter alia*, Microvast's ability to reach its margin targets and its ability to complete the Huzhou Phase 3.2 expansion by the end of 2025.

46. For example, on August 11, 2025, Microvast issued a press release announcing its financial and operating results for the quarter ended June 30, 2025. The press release quoted Defendant Wu as touting the Company's quarterly gross margin among other metrics as "a

testament to . . . the effectiveness of our relentless focus on profitability and operational efficiency":

> "Continuing to build upon our momentum, Microvast is charting an exceptional course. We delivered a record second quarter, with revenue reaching $91.3 million, marking a 9.2% year-over-year increase. This growth is matched with gross margin expansion to 34.7%. While we booked a GAAP net loss of $106.1 million, we also achieved a positive adjusted EBITDA of $25.9 million. ***These results are a testament to*** the increasing demand for our advanced battery solutions and ***the effectiveness of our relentless focus on profitability and operational efficiency***," said Yang Wu, Microvast's Founder, Chairman, and Chief Executive Officer. [Emphasis added].

47. Also during the Q2 Earnings Call, Defendant Wu provided investors with an update on Microvast's outlook for the rest of the calendar year. Among other items, Defendant Wu reported that the Company was raising its gross margin target from 30% to 32%, reiterated the Individual Defendants' expectation that the Huzhou Phase 3.2 initiative would "come online later this year", and stated that the Individual Defendants "expected" Microvast's "high-growth EMEA business" to "maintain its strong momentum":

> For the remainder of 2025, our initial revenue guidance holds firm. We are targeting a year-over-year revenue increase of 18% to 25%, which put[s] our projected range between $450 million and $475 million. ***We are slightly updating our targeted full year gross margin from 30% to 32% as we are focusing on stronger performing, higher-margin products***. In our APAC operations, all eyes are on ***our Phase 3.2 expansion at the Huzhou facility, which we anticipate will come online later this year***. This additional capacity of up to 2 gigawatt-hour annually is a direct response to the robust customer demand for our solutions. Our development teams are also making significant progress on the next wave of advanced products. ***Our high-growth EMEA business is expected to maintain its strong momentum***, continuing to drive significant year-over-year revenue increases. We are actively pursuing new strategic partnerships to support both our current and upcoming product lines in the region. [Emphasis added].

48. Defendant Wu made clear to investors that the Individual Defendants remained focused on Microvast's margins, stating inter alia: "We remain laser-focused on achieving our priorities for the remainder of this year which are achieving positive cash flow, sustaining our

strong margins and expanding our market reach through relentless, innovation and strategic collaboration."

49. The statements referenced above were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) due to inventory management issues and delays in commercial vehicle rollouts by Microvast's customers, the Individual Defendants had overstated Microvast's ability to reach its margin targets; (ii) the Individual Defendants overstated Microvast's ability to complete the Huzhou Phase 3.2 expansion by the end of 2025; and (iii) as a result, the Individual Defendants' public statements were materially false and misleading at all relevant times.

50. On September 10, 2025, the Company filed a proxy statement on Schedule 14A with the SEC (the "2025 Proxy"). The Director Defendants solicited the 2025 Proxy, which asked the Company's shareholders to vote to, among other things, re-elect Defendant Ying to serve on the Board.

51. With respect to the Board's Risk Oversight Function, the 2025 Proxy stated the following:

> Our Audit Committee is responsible for overseeing our risk management process. Our Audit Committee focuses on our general risk management strategy and the most significant risks facing us and oversees the implementation of risk mitigation strategies by management. Our Audit Committee is apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions.
>
> Our Compensation Committee is principally responsible for establishing, overseeing and administering our compensation plans and policies for our executive officers, including our equity incentive plans. Our Compensation Committee is also responsible for overseeing risks related to our compensation programs and practices. Our Compensation Committee has assessed the risk

> associated with our compensation policies and practices for our employees and determined that the risks associated with such policies and practices are not reasonably likely to have a material adverse effect on us. Our Compensation Committee utilizes compensation practices that it believes discourage our employees from excessive risk-taking that could be reasonably likely to have a materially adverse effect on us.

52. The 2025 Proxy was materially false and misleading because it failed to disclose, *inter alia*, that: (i) due to inventory management issues and delays in commercial vehicle rollouts by Microvast's customers, the Individual Defendants had overstated Microvast's ability to reach its margin targets; (ii) the Individual Defendants overstated Microvast's ability to complete the Huzhou Phase 3.2 expansion by the end of 2025; and (iii) as a result, the Board was not adequately exercising its risk oversight function.

53. These representations were material to the Company's shareholders because they related to the functioning and the internal governance of the Company. As such, had the Company's shareholders known the truth, then it likely would have impacted how they voted on the proposals in the 2025 Proxy.

54. As a result of the false and misleading statements contained in the 2025 Proxy, the Company's shareholders voted to re-elect Defendant Ying the Board.

55. On November 10, 2025, Microvast filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for the quarter ended September 30, 2025, and issued a press release announcing the same (the "Q3 Earnings Release").

56. The Q3 Earnings Release revealed to the market that the Individual Defendants now expected that the Huzhou Phase 3.2 expansion's additional production capacity would only come online after the end of the year despite the Individual Defendants' repeated assurances that production would begin during 2025, stating:

> 2025 Outlook: . . . The Company is updating gross margin outlook for full year 2025 from 32% to a target range of 32% to 35%; The Company expects to finish installation and commissioning of production equipment for our Huzhou Phase 3.2 expansion by year-end ***with initial production to follow***, increasing our capacity to meet strong customer demand[.] [Emphasis added].

57. Defendant Wu repeated this revelation during the conference call Microvast held to discuss the financial and operating results announced in the Q3 Earnings Release. When providing investors an update concerning the Huzhou Phase 3.2 expansion, Defendant Wu stated for the first time that the Individual Defendants "anticipate this new line initial production to begin in Q1 2026":

> I'm pleased to report that we are in the final stages of installing and commissioning the production equipment with completion targeted for year-end, this expansion is critically important as Phase 3.2 is anticipated to add up to 2 Gigawatt hour of annual production capacity. The strategic timing of this expansion is intended to directly address existing market demand and position us to capture upcoming opportunities. ***We anticipate this new line initial production to begin in Q1 2026***. This expansion is a major step forward, securing our foundation for continued growth in 2026 and beyond. [Emphasis added].

58. On this news, Microvast's stock price fell $0.50 per share, or approximately 10%, to close at $4.48 per share on November 11, 2025.

59. Notwithstanding the foregoing disclosures and resulting drop in Microvast's share price, Microvast's stock continued to trade at artificially inflated prices due to the Individual Defendants' continued false and misleading statements about, *inter alia*, Microvast's ability to reach its margin targets.

60. For example, the Q3 Earnings Release quoted Defendant Wu as touting the Company's gross margin for the quarter, which he claimed "reflect[ed] continued improvements in efficiency and product mix":

> "Microvast is on an impressive trajectory, achieving a record third quarter with revenue of $123.3 million, a 21.6% increase year-over-year. Our gross margin rose to 37.6%, reflecting continued improvements in efficiency and product mix. While

> we booked a GAAP net loss of $1.5 million, we also delivered a positive adjusted EBITDA of $21.9 million, demonstrating the growing demand for our innovative battery solutions and the tangible results of our focus on profitability and operational excellence," said Yang Wu, Microvast's Founder, Chairman, and Chief Executive Officer.

61. The Q3 Earnings Release also announced the Individual Defendants were raising their expected annual gross margin "from 32% to a target range of 32% to 35%": "2025 Outlook: . . . The Company is updating gross margin outlook for full year 2025 from 32% to a target range of 32% to 35%[.]"

62. Defendant Wu repeated the new margin guidance when providing the Individual Defendants' outlook "for the rest of the year" during the Q3 Earnings Call, and reassured investors that Microvast's EMEA business "is expected to maintain momentum":

> Please turn to Slide 15, which provides a summary of our outlook for the rest of the year. We are pleased to affirm our initial annual revenue guidance, which positions our projected revenue in the range of $450 million to $475 million. Due to our focus on stronger performing segments and a successful margin expansion efforts, ***we are also raising our full year gross margin target from 32% to a new range of 32% to 35%***. . . . We expect a strong sales growth for the year, and our development teams are making significant progress on the next wave of advanced products. ***Our EMEA business is expected to maintain momentum***. [Emphasis added].

63. The statements referenced above were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) due to inventory management issues and delays in commercial vehicle rollouts by Microvast's customers, the Individual Defendants had overstated Microvast's ability to reach its margin targets; (ii) the Individual Defendants overstated Microvast's ability to complete the Huzhou Phase 3.2 expansion by the end of 2025; and (iii) as a result, the Individual Defendants' public statements were materially false and misleading at all relevant times.

**THE TRUTH FULLY EMERGES**

64. On March 16, 2026, Microvast filed with the SEC an annual report on Form 10-K reporting its fourth quarter and full year 2025 financial results and issued a press release announcing the same (the “FY 2025 Earnings Release”). Among other items, Microvast reported revenue of $96.5 million for the quarter, representing a 15% year-over-year decrease and falling well short of the consensus estimate of $136.4 million. In the FY 2025 Earnings Release, Microvast attributed the results to “regulatory shifts in South Korea and delays in customer platform ramp-up” in Europe, the Middle East, and Africa.

65. Also in the FY 2025 Earnings Release, Microvast reported that gross margin declined to approximately 1% for the quarter, down sharply from approximately 36% for the same period in the prior year, which the Company attributed to “inventory impairment charges”:

> Gross margin decreased to 1.0%, compared to 36.6% in Q4 2024, this change was primarily attributable to inventory impairment charges, which negatively impacted our gross margin by 30.1 percentage points; Non-GAAP adjusted gross margin decreased to 1.0%, compared to 36.7% in Q4 2024.

66. During a conference call Microvast held to discuss its financial results for the fiscal quarter and year ended December 31, 2025 (the “FY 2025 Earnings Call”), Defendant Worthen specified that this inventory impairment charge arose from “specialized ESS components”:

> Full year gross profit reached $122.1 million. This resulted in full year gross margin of 28.6% compared to 31.5% in 2024. This change was primarily attributable to $32.5 million in inventory impairment charge related to specialized ESS components, which negatively impacted our gross margin by 7.6 percentage points.

67. The Form 10-K that Microvast filed that day stated that the $32.5 million impairment charge that caused the company to miss its twice-raised gross margin guidance arose from ESS inventory that “was specifically manufactured for a customer and did not generate any associated revenue during 2025.”

68. Also during the FY 2025 Earnings Call, Defendant Wu provided an update on the Huzhou Phase 3.2 expansion, stating that "[t]rial production" had begun for a portion of one of Microvast's products, and claimed "[w]e are on track to achieve serial production in 2026":

> In APAC, while we navigated a regulatory environment in Korea, we are focused on a long-term via our Huzhou Phase 3.2 expansion, which is expected to bring additional capacity online in 2026. . . . [O]ur Huzhou Phase 3.2 project is progressing well with clean rooms and utility equipment already in operation. Trial production for our 55 amp-hour cell has begun on the electrode section, assembly and formation, and no-load test has started. This expansion is a critical component of our growth strategy as Phase 3.2 is expected to add up to 2 gigawatt hour of annual production capacity . . . . [The Huzhou Phase 3.2] expansion remains our primary operational catalyst for the year. We are on track to achieve serial production in 2026. Phase 3.2 is a critical milestone that brings online the capacity necessary to meet upcoming demand for our next-generation cell technology.

69. On this news, Microvast's stock price fell $0.79 per share, or 34.2%, to close at $1.52 per share on March 17, 2026.

## DAMAGES TO THE COMPANY

### Securities Class Action

70. On July 21, 2026, a securities class action complaint was filed in the United States District Court for the Southern District of Texas against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, in the case captioned: *Graham v. Microvast Holdings, Inc., et al.*, Case No. 4:26-cv-05804 (S.D. Tex.) ("Securities Class Action").

71. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

### Unjust Compensation

72. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

73. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

74. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damages to the Company**

75. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

76. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

77. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

78. At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

79. Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

### Code of Ethics

80. At all material times, the Company had in place its Code of Ethics which "sets forth requirements for honest and ethical conduct, ensures compliance with applicable governmental laws, rules and regulations and provides accountability for adherence to this Code." The Code of Ethics applies to "the directors, officers and employees of the Company."

81. From the outset, the Code of Ethics emphasizes the importance of ethical conduct, stating that: "The Company's good name and reputation depend, to a very large extent, upon you taking personal responsibility for maintaining and adhering to the policies and guidelines set forth in this Code. Your conduct on behalf of the Company must be guided by the ethical principles, policies and guidelines set forth in this Code."

82. With respect to "Public Reporting," the Code of Ethics states, in relevant part:

> Microvast Holdings is a public company and, as a result, files reports and other documents with the United States Securities and Exchange Commission (the "SEC") and Nasdaq, on which its common stock trades. In addition, Microvast Holdings issues press releases and makes other public statements in accordance with its Corporate Disclosure Policy that include financial and other information about the Company's business, financial condition and results of operations. Microvast Holdings endeavors to make full, fair, accurate, timely and understandable disclosures in reports and documents it files with, or submits to, the SEC and in its press releases and public communications.
>
> * * *
>
> The laws and regulations applicable to filings made with the SEC, including those applicable to accounting matters, are complex. While the ultimate responsibility for the information included in these filings rests with Company management, numerous other employees participate in the preparation of these filings or provide information included in these filings. The Company maintains disclosure controls and procedures to ensure that the information included in these filings is collected and communicated to Company management in order to permit timely disclosure of such information.

83. In a section entitled "Compliance with Laws, Rules and Regulations," the Code of Ethics states:

> The Company is obligated to comply with all applicable laws, rules and regulations, including with respect to human rights, forced labor, child labor, human trafficking, bribery, discrimination, harassment and pay equity. The Company strives to conduct its business ethically and in a way that demonstrates respect for globally recognized human rights and the dignity of all people. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company. Company management is also required to promote compliance with the Code by all employees and to abide by Company standards, policies and procedures.

84. The Individual Defendants failed to adhere to the Code of Conduct when they issued false and misleading statements and engaged in the wrongdoing described herein. Additionally, the Individual Defendant's failure to maintain the accuracy of Company records and reports, along with their failure to report other mismanagement, violates the Code of Conduct's sections regarding ethical obligations, confidentiality, and company assets.

**Audit Committee Charter**

85. The Company has in place its Audit Committee Charter which sets forth the additional duties and responsibilities of the Audit Committee members. The Audit Committee Charter provides that the purpose of the Audit Committee is to, *inter alia*: (i) oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements; (ii) prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement; and (iii) oversee and review the Company's guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by Company management.

86. The Audit Committee Charter further sets out the following specific responsibilities of the Audit Committee:

> [] The Committee shall review and discuss with Company management (including the Senior Accounting Executives) and with the independent auditors the Company's annual and quarterly audited financial statements, including (a) all critical accounting policies, practices and controls used or to be used by the Company and any other matters required by Sections 302 and 404 of the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder by the SEC, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.
>
> [] [Committee shall review] any analyses prepared by Company management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements. The Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements and the treatment preferred by the independent auditors. The Committee may also consider other material written communications between the independent auditors and Company management, such as any management letter or schedule of unadjusted differences.
>
> [] [Committee shall review] major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies, as well as the Company's disclosures regarding internal controls.

[] The Committee shall discuss with the Chief Executive Officer and Chief Financial Officer of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving Company management or other employees who have a significant role in the Company's internal control over financial reporting.

[] The Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

[] The Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by Company management.

[] The Committee shall discuss with Company management or outside legal counsel and the independent auditors and review with the Board the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements. After these discussions, the Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

[] The Committee may perform such other oversight functions outside of its stated purpose as may be requested by the Board from time to time.

87. The Audit Committee failed to uphold their duties required by the Audit Committee Charter by failing to conduct oversight of the Company's engagement in the Individual Defendant's issuing false and misleading statements to the public. Furthermore, the Audit Committee violated the Audit Committee Charter by failing to maintain the accuracy of Company reports and records, failing to comply with laws and regulations, and failing to properly report violations to the rest of the Audit Committee.

## DUTIES OF THE DIRECTOR DEFENDANTS

88. As members of the Company's Board, the Director Defendants were held to the

highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

89. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

90. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

91. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

92. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

93. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise

of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

94. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

95. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

96. Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

97. Plaintiffs are current owners of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiffs understand their obligation to hold stock throughout the duration of this action and is prepared to do so.

98. Because of the facts set forth herein, Plaintiffs have not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile

and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

99. The Company Board is currently comprised of five (5) members – including Defendants Wu, Ying, Wong, Pan, and Tushe. Thus, Plaintiffs are required to show that a majority of the Director Defendants, *i.e.*, three (3), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

100. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

## DEFENDANT WU CONTROLS THE BOARD

101. The Directors each lack independence from, and are all beholden to, Defendant Wu, who holds immense power at the Company and directly oversees all aspects of the Company's operations and strategy.

102. As the Company's controlling shareholder with 37.3% of voting power, Defendant Wu has significant power to influence and/or determine the outcome of a shareholder vote, including the re-election of the directors.

103. Demand on the directors is futile because Defendant Wu wields such overwhelming influence and control within the Company that these purportedly independent directors are neither disinterested nor capable of exercising independent business judgment with respect to the claims asserted herein.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT

104. Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

105. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

106. Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

107. As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

108. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders,

authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

109. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

110. Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Defendant Wu**

111. Defendant Wu is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its Founder, President, and CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent, as admitted by the Company in its 2023 Proxy Statement. As such, Defendant Wu cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

112. As CEO, Defendant Wu also fails the Nasdaq's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Wu could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Wu is therefore futile.

113. In addition, Defendant Wu receives lucrative compensation in connection with his employment with the Company. Defendant Wu is not independent from the Director Defendants

that comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Wu. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Wu could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

114. Because of Defendant Wu's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Wu is unable to comply with his fiduciary duties and prosecute this action. Defendant Wu is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action, brought under the Securities Exchange Act of 1934.

**Defendant Pan**

115. During the alleged wrongdoing, while the Company's share price was artificially inflated as a result of the false and misleading statements, Defendant Pan, on the basis of material, non-public information, sold her personally-held Microvast common stock. Accordingly, Defendant Pan faces a substantial likelihood of liability for her insider trading and also received a material personal benefit as a result. As such, she cannot be considered independent.

**Defendants Pan, Wong, and Ying**

116. Defendants Pan, Wong, and Ying served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial

statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

117. Defendants Pan, Wong, and Ying breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Pan, Wong, and Ying face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Futile**

118. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

119. The Company, at all material times, had its Code of Ethics and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Ethics and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

120. In violation of the Code of Ethics, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the

Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Ethics, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

121. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

122. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

123. Publicly traded companies, such as Microvast, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose

a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

124. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## FIRST CAUSE OF ACTION

## (Against the Individual Defendants for Breach of Fiduciary Duties)

125. Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

126. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

127. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

128. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to issue the materially false and misleading statements as described herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

129. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the

misconduct alleged herein, the Individual Defendants are liable to the Company.

130. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**SECOND CAUSE OF ACTION**

**(Against the Individual Defendants for Gross Mismanagement)**

131. Plaintiffs incorporate by reference and re-allege each allegation contained above, as though fully set forth herein.

132. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

133. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

134. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

135. Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

136. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

137. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

138. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against The Individual Defendants for Unjust Enrichment)**

139. Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

140. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

141. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

142. Plaintiffs, as shareholders and representatives of the Company, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including

from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## FIFTH CAUSE OF ACTION

### (Against the Director Defendants for Violations of Section 14(a) of the Exchange Act)

143. Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

144. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

145. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

146. The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

147. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 Proxy, which

was filed with the SEC. As alleged above, the 2025 Proxy was materially false and misleading because it failed to disclose that, *inter alia*, (i) due to, *inter alia*, inventory management issues and delays in commercial vehicle rollouts by Microvast's customers, the Individual Defendants had overstated Microvast's ability to reach its margin targets; (ii) the Individual Defendants overstated Microvast's ability to complete the Huzhou Phase 3.2 expansion by the end of 2025; and (iii) as a result, the Board was not adequately exercising its risk oversight function.

148. The misrepresentations and omissions in the 2025 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2025 Proxy, including, but not limited to, the re-election of certain Individual Defendants.

149. The materially false and misleading statements contained in the 2025 Proxy improperly induced shareholders to vote for the reelection of Defendant Ying to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

150. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2025 Proxy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment as follows:

A. Declaring that Plaintiffs may maintain this action on behalf of the Company and that Plaintiffs are adequate representatives of the Company;

B. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, and unjust enrichment;

C. Awarding, against the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of Section 14(a) of the Exchange Act;

D. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein, including but not limited to removing and replacing its officers and directors;

E. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Awarding such other and further relief as is just and equitable.

**JURY DEMAND**

Plaintiffs demands a trial by jury on all issues so triable.

Dated: October 30, 2026

**THE BROWN LAW FIRM, P.C.**

*/s/ Saadia Hashmi*
Saadia Hashmi
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: shashmi@thebrownlawfirm.net

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com

Email: gegleston@gme-law.com

***Attorneys for Plaintiffs***

**VERIFICATION**

I, MATTHEW PIXLEY, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Microvast Holdings, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Microvast Holdings, Inc. common stock at all relevant times.

Matthew Pixley

MATTHEW PIXLEY

**VERIFICATION**

I, JOSEPH FERNICOLA, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Microvast Holdings, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Microvast Holdings, Inc. common stock at all relevant times.

Joseph Fernicola
JOSEPH FERNICOLA